**INMATES OF the NEBRASKA PENAL AND CORRECTIONAL COMPLEX, Plaintiff,**

**v.**

**John B. GREENHOLTZ, Individually and as Chairman, Nebraska Board of Paroles, et al., Defendants.**

**Robert O. McDONNELL, Plaintiff,**

**v.**

**John B. GREENHOLTZ, Individually and as Chairman, Nebraska Board of Paroles, et al., Defendants.**

Civ. Nos. 72–L–335 and 73–L–150.

United States District Court, D. Nebraska.

July 14, 1976.

On Motion to Alter or Amend Dec. 7, 1976.

Gary L. Dolan, Lincoln, Neb., Roy S. Haber and Walter R. Echo-Hawk, Native American Rights Fund, Boulder, Colo., for subclass of inmates alleging denial of parole for racially discriminatory reasons.

John C. Gourlay, Lincoln, Neb., for subclass of inmates alleging denial of parole for seeking access to the courts (subclass includes plaintiff Robert McDonnell).

Brian Ridenour, Lincoln, Neb., for subclass of inmates alleging violation of due process at parole proceedings.

Ralph H. Gillan, Asst. Atty. Gen., Lincoln, Neb., for defendants.

## MEMORANDUM OPINION

SCHATZ, District Judge.

These actions, which were consolidated for trial, were brought under 42 U.S.C. § 1983 by inmates of the Nebraska Penal Complex to obtain relief from alleged deprivations of their civil rights. *McDonnell v. Greenholtz*, CIV. 73-L-150, was brought by an individual plaintiff, Robert McDonnell, alleging that he was deprived of parole because he had filed a number of lawsuits against various prison officials. At the time the action was filed, McDonnell was an inmate of the Nebraska Penal Complex, but he received a mandatory parole to a federal detainer in June, 1974, and is no longer an inmate at the Penal Complex. *Inmates v. Greenholtz*, CIV. 72-L-335, is a class action brought by inmates incarcerated in the Nebraska Penal Complex. It was divided into two subclasses: one whose members alleged denial of parole or work release because they had sought access to the courts, and one whose members alleged denial of parole and work release for racially discriminatory reasons. Counsel was appointed to represent the plaintiffs in both actions. All plaintiffs seek injunctive relief and money damages from the defendants. The defendants in both actions are the individual members of the Nebraska Board of Parole [sometimes referred to as Board]. Jurisdiction is present under 28 U.S.C. § 1343.

Nebraska has a comprehensive statutory system establishing and regulating the Board of Parole. The Board was comprised of three members, later enlarged to five members, who were appointed by the governor and confirmed by the legislature. Neb.Rev.Stat. § 83-189. The Board presently consists of three white men, one black man, and one white woman. The Board's powers and duties, so far as material here, are defined by statute:

The Board of Parole shall:

(1) Determine the time of release on parole of committed offenders eligible for such release;

(2) Fix the conditions of parole, revoke parole, issue or authorize the issuance of warrants for the arrest of parole violators, and impose other sanctions short of revocation for violation of conditions of parole;

(3) Determine the time of discharge from parole;

\* \* \* \* \* \*

(5) Serve in an advisory capacity to the Director of Corrections in administering parole services within any facility and in the community;

\* \* \* \* \* \*

(7) Conduct research for the purpose of evaluating and improving the effectiveness of the parole system;

\* \* \* \* \* \*

(9) Review the record of every committed offender, whether or not eligible for parole, not less than once each year. Such review shall include the circumstances of the offender's offense, the presentence investigation report, his previous social history and criminal record, his conduct, employment, and attitude during commitment, and the reports of such physical and mental examinations as have been made. The board shall meet with such offender and counsel him concerning his progress and his prospects for future parole;

(10) Make rules and regulations for its own administration and operation;

(11) Appoint and remove all employees of the board and delegate appropriate powers and duties to them.

 * * * * * *

(13) Exercise all powers and perform all duties necessary and proper in carrying out its responsibilities under the provisions of this act.
Neb.Rev.Stat. § 83–192.

Each inmate, whether or not eligible for parole, is entitled to a review of his parole status at least once a year. Neb.Rev.Stat. § 83–192. Each inmate is entitled to a parole hearing before the Board within sixty days before the expiration of his minimum term, less time allowed for good behavior, or if there is no minimum, within ninety days of his commitment. Neb.Rev. Stat. § 83–1,111(1).

Parole eligibility and release from the institution are also governed by a complex statutory system. An inmate must be released from the institution after he has served his maximum sentence, less reductions for good behavior, as provided by statute, or three months prior to discharge from his sentence, whichever is earlier. Neb.Rev.Stat. § 83–1,111(5). This is referred to as "mandatory parole" because the release is required by law, but the inmate still remains subject to some parole conditions until his sentence expires. If an inmate is eligible,[1] the Board may release him from the institution at an earlier time. This is referred to as "discretionary parole" because the Board is given the discretion by state law, Neb.Rev.Stat. § 83–192, to release an inmate on early parole.

In making the decision whether to grant a discretionary parole, the Board must consider certain factors such as the inmate's prison record, including his evaluation and progress reports; his presentence report; the sentencing judge's recommendations; any relevant information submitted by the inmate, his attorney or others; and other items. Neb.Rev.Stat. § 83–115. State law lists the reasons for which parole shall be deferred and the factors which must be taken into account by the Board:

(1) Whenever the Board of Parole considers the release of a committed offender who is eligible for release on parole, it shall order his release unless it is of the opinion that his release should be deferred because:

(a) There is a substantial risk that he will not conform to the conditions of parole;

(b) His release would depreciate the seriousness of his crime or promote disrespect for law;

(c) His release would have a substantially adverse effect on institutional discipline; or

(d) His continued correctional treatment, medical care, or vocational or other training in the facility will substantially enhance his capacity to lead a law-abiding life when released at a later date.

(2) In making its determination regarding a committed offender's release on parole, the Board of Parole shall take into account each of the following factors:

(a) The offender's personality, including his maturity, stability, sense of responsibility and any apparent development in his personality which may promote or hinder his conformity to law;

(b) The adequacy of the offender's parole plan;

---

1. Eligibility for parole is also determined by state statutes. For purposes of this case, the parties have stipulated as to the rules by which eligibility for parole was determined.

(c) The offender's ability and readiness to assume obligations and undertake responsibilities;

(d) The offender's intelligence and training;

(e) The offender's family status and whether he has relatives who display an interest in him or whether he has other close and constructive associations in the community;

(f) The offender's employment history, his occupational skills, and the stability of his past employment;

(g) The type of residence, neighborhood or community in which the offender plans to live;

(h) The offender's past use of narcotics, or past habitual and excessive use of alcohol;

(i) The offender's mental or physical makeup, including any disability or handicap which may affect his conformity to law;

(j) The offender's prior criminal record, including the nature and circumstances, recency and frequency of previous offenses;

(k) The offender's attitude toward law and authority;

(*l*) The offender's conduct in the facility, including particularly whether he has taken advantage of the opportunities for self-improvement, whether he has been punished for misconduct within six months prior to his hearing or reconsideration for parole release, whether any reductions of term have been forfeited, and whether such reductions have been restored at the time of hearing or reconsideration;

(m) The offender's behavior and attitude during any previous experience of probation or parole and the recency of such experience; and

(n) Any other factors the board determines to be relevant.

Neb.Rev.Stat. § 83–1,114.

The Board's decision, which is determined by a majority vote, must be based on the entire record before the Board. Neb.Rev.Stat. § 83–1,111(2).

The plaintiffs do not claim that they are entitled to an immediate release on parole. Their claim is that the defendants have denied parole to otherwise eligible inmates for constitutionally impermissible reasons: because they have sought access to the courts or because of their race.

## ACCESS TO COURTS

The Board had a long-standing policy of not considering an otherwise eligible inmate for discretionary parole if, at the time his parole status was reviewed, he had legal actions pending in the courts. This policy was in effect in 1970 when defendant Greenholtz became Chairman of the Parole Board and the policy continued until 1973. In the fall of 1973 the Board abolished this policy on the grounds that it interfered with the inmate's right to seek redress of his grievances in the courts. There is no credible evidence that, after that date, the Board has deferred or denied parole to any eligible inmate for the reason that he had an action pending in the courts.

■ It is obvious that access to the courts is a fundamental right of every citizen, including those persons confined in prisons. It is absolutely essential that those individuals be afforded every reasonable opportunity to present their complaints to the courts and to obtain a judicial resolution of those complaints. *Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969); *Burns v. Swenson*, 430 F.2d 771 (8th Cir. 1970). The Fifth Circuit has held:

[E]very prisoner has a constitutional right of access to the courts to present any complaints he might have concerning his confinement. He cannot be disciplined in any manner for making a reasonable attempt to exercise that right. Access to the courts is a fundamental precept of our system of government. No citizen, regardless of his transgressions, is ever to be legally consigned to the total and unreviewed power of any single branch of government.

*Andrade v. Hauck*, 452 F.2d 1071, 1072 (5th Cir. 1971).

The Board's policy of not considering an inmate for parole if he had legal actions pending punished those inmates who had sought relief in the courts and discouraged other inmates from seeking relief in court. This policy obstructed the inmates' access to the courts in violation of their constitutional rights. *Andrade v. Hauck, supra.*

■ The defendants do not seriously attempt to justify their practice, but they argue that relief is not warranted because this practice has long since been discontinued. Since the evidence shows that the Board has discontinued this practice and that it will not be applied in the future, there is no threat of future irreparable injury and an injunction is, therefore, not necessary. *United States v. Oregon State Medical Society,* 343 U.S. 326, 333–34, 72 S.Ct. 690, 96 L.Ed. 978 (1952).

■ The plaintiffs also seek money damages against the individual members of the Board. The Board members, in considering which inmates should be granted a discretionary parole, were performing a quasi-judicial function and are clothed with quasi-judicial immunity from money damages. *E. g., Pope v. Chew,* 521 F.2d 400 (4th Cir. 1975); *Cruz v. Skelton,* 502 F.2d 1101 (5th Cir. 1974); *Silver v. Dickson,* 403 F.2d 642 (9th Cir. 1968).[2] Therefore, the plaintiffs are not entitled to money damages under these circumstances.

## RACIAL DISCRIMINATION

■ The protection of the Fourteenth Amendment does not stop at the prison walls. *See, e. g., Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). It is clear that a state, having granted rights and privileges to inmates, may not deny those rights and privileges to inmates because of their race. The Courts will not tolerate racial discrimination in prisons. *See, e. g., Lee v. Washington,* 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212

(1968); *Thomas v. Brierley,* 481 F.2d 660 (3d Cir. 1973); *Jackson v. Godwin,* 400 F.2d 529 (5th Cir. 1968); *Owens v. Brierley,* 452 F.2d 640 (3d Cir. 1971); *Rivers v. Royster,* 360 F.2d 592 (4th Cir. 1966); *Worley v. Bounds,* 355 F.Supp. 115 (W.D.N.C.1973); *McClelland v. Sigler,* 327 F.Supp. 829 (D.Neb. 1971), aff'd, 456 F.2d 1266 (8th Cir. 1972). Although there may be special problems in connection with a federal court dictating to a state official how he must exercise his discretion, it is nevertheless clear that a state official may not use his discretion to deny a right or opportunity to an individual because of his race. *E. g., Carter v. Jury Commission,* 396 U.S. 320, 90 S.Ct. 518, 24 L.Ed.2d 549 (1970); *Hawkins v. Town of Shaw, Mississippi,* 437 F.2d 1286 (5th Cir. 1971), reaffirmed en banc, 461 F.2d 1171 (5th Cir. 1972). See also *Gomilliom v. Light Foot,* 364 U.S. 339, 347, 81 S.Ct. 125, 130, 5 L.Ed.2d 110 (1960), in which Justice Frankfurter stated:

> When a state exercises power wholly within the domain of state interests, it is insulated from federal judicial review. But such insulation is not carried over when state power is used as an instrument for circumventing a federally protected right.

### Due Process

In the plaintiffs' post-trial briefs it is claimed that the inmates were deprived due process of law in many respects. However, the plaintiff subclass was defined to be those inmates claiming denial of parole for racially discriminatory reasons and the trial was limited to that issue. Therefore, the plaintiffs' claims of denial of due process of law will be considered only insofar as they relate to the issue of racial discrimination.

■ The plaintiffs argue that due process of law protects individuals from arbitrary government action, that is, action bottomed on misinformation or so unsupported

---

**2.** Even if the defendants were only protected by a qualified immunity, such as that expressed in *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), there has been nothing to indicate that the defendants deliberately pursued this policy in order to deny the inmates access to the courts or that their actions were in such disregard of clearly established rights as to constitute bad faith.

by evidence that it lacks a rational basis. The plaintiffs' witnesses testified that black, white, Indian and Mexican-American cultures have different cultural and social values. For example, Indian society is and has been more dependent on communalism than on what might be called white American society, and so an Indian's work habits might not be as aggressive, individualistic and competitive as a white man's even though the Indian work habits conform to and are accepted under the standards of Indian society. The witnesses testified that an individual's suitability for parole should be judged according to standards relating to his own culture. Because of the differences between cultures, it was reasoned, an individual from one culture could not properly evaluate an individual from another culture unless he was familiar with the standards and values of that person's culture. The witnesses analyzed portions of testimony and some out-of-court remarks made by some of the defendants and determined that the defendants were not capable of evaluating the suitability for parole of an Indian or Mexican-American. The sum and substance of this argument is that an Indian's suitability for parole, for example, must be evaluated by standards applicable only to Indians and that a white man is unable to make a proper evaluation unless he has studied extensively about the Indian culture. In other words, racially neutral parole standards are arbitrary and capricious.

The Court considers this argument and the testimony supporting it as frivolous. It is true that a man who is knowledgeable about an inmate's culture and the social environment from which he came might make a more informed evaluation of his suitability for parole than an individual without such information. But this Court knows of no authority, and is cited to none, which holds that the failure to base a decision on attributes peculiar to one race or culture is arbitrary and capricious.

### Equal Protection

■ The defendants testified at trial that they applied the criteria contained in Neb. Rev.Stat. § 83–1114(2) equally to each inmate, and that they determined each inmate's suitability for parole without regard to his race. The plaintiffs, apparently accepting this testimony as true for the sake of argument, claim that such a neutral policy violates the Equal Protection Clause. Relying heavily on employment discrimination cases under Title VII of the Civil Rights Act of 1964, they argue that once it has been shown that the application of a facially neutral policy has a racially disproportionate effect, that policy becomes constitutionally suspect, and the burden shifts to the defendants to demonstrate a compelling state interest to justify that policy.

Even assuming the plaintiffs have satisfactorily proven a racially disproportionate impact (*see infra* 438 – 442), this argument is completely without merit. The courts have consistently rejected the simplistic argument that every state action which disadvantages a group, the greater number of which is composed of racial minorities, standing alone, violates constitutional standards. The Supreme Court in rejecting such argument has recently stated:

> Nevertheless, we have not held that a law neutral on its face and serving ends otherwise within the power of government to pursue, is invalid under the Equal Protection Clause simply because it may effect a greater proportion of one race than of another. Disproportionate impact is not irrelevant, but it is not the sole touch stone of an invidious racial discrimination forbidden by the Constitution. Standing alone, it does not trigger the rule that racial classifications are to be subjected to the strictest scrutiny and are justifiable only by the weightiest of considerations. (Citation omitted.)

*Washington v. Davis*, 426 U.S. 229, at 242, 96 S.Ct. 2040, at 2049, 48 L.Ed.2d 597 (1976).

In the absence of proof of purposeful discrimination, the neutral application of the statutory criteria in determining suitability for parole does not violate constitutional

standards. *See also Jefferson v. Hackney,* 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972); *James v. Valtierra,* 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971); *Tyler v. Vickery,* 517 F.2d 1089 (5th Cir. 1975); *Acevedo v. Nassau County,* 500 F.2d 1078 (2d Cir. 1974). In so holding this Court expressly rejects plaintiffs' arguments that the standards under Title VII should be applied to such an action based solely on the Fourteenth Amendment. *Washington v. Davis, supra; Tyler v. Vickery, supra.*

Alternatively, the plaintiffs argue that the defendants have not been granting parole in a neutral fashion without regard for race. In fact, they argue, the defendants have purposefully discriminated against Indian and Mexican-American inmates in awarding discretionary paroles, hiding their discrimination under the discretion provided by state law.[3] The plaintiffs rely primarily on statistical evidence which they claim shows a disparity among races in the awarding of discretionary paroles. They also rely to some extent on statements made by some defendants which they assert show a prejudice against Indians. The Court has examined those statements, which are subject to varying interpretations, and affords them little or no weight in determining whether the defendants have discriminated against Indians and Mexican-Americans.

Because of the importance of the statistical evidence in the plaintiffs' case, it is necessary to review it in some detail.

The plaintiffs submitted a study (Exhibit 9) which purported to show that, of the inmates released on parole during a two-year period, a higher percentage of white and black inmates were released on discretionary parole than Indians or Mexican-Americans: 51 per cent of the Caucasian inmates released on parole were released on discretionary parole; 57.7 per cent of the black inmates released on parole were released on discretionary parole; 22.2 per cent of Mexican-American inmates released on parole were released on discretionary parole; 40.8 per cent of the American Indian inmates released on parole received discretionary paroles. The defendants prepared a study (Exhibit 15) which purported to rebut the plaintiffs' figures. The Court affords no weight to either study. Neither study considered the total number of inmates who were eligible for discretionary parole, and without this information neither study provides an adequate basis on which to compare the defendants' treatment of the races. *Cf. Mayor of Philadelphia v. Educational Equality League,* 415 U.S. 605, 620–21, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974).

On rebuttal the plaintiffs introduced a statistical study (Exhibit 18) which showed the number of inmates of each race eligible for discretionary parole and the number that were released on discretionary parole during the years 1972 and 1973. During that period there were about twenty-two hundred male inmates confined at the Penal Complex at one time or another. The plaintiffs studied the files of all such inmates except for a small number of files that had been misplaced. The plaintiffs claim that the following figures show a significant disparity in the treatment of races:

| | White | Black | Nat. Amer. | Mex. Amer. | TOTAL |
|---|---|---|---|---|---|
| Eligible for release by discretionary parole | 590 | 235 | 61 | 17 | 903 |
| Received discretionary parole | 358 | 148 | 24 | 5 | 535 |
| Did not receive discretionary parole | 232 | 87 | 37 | 12 | 368 |

Some matters about this study deserve mention. First, some inmates were counted twice because they were eligible for parole twice. For example, if an inmate had received a discretionary parole but had that parole revoked, under the stipulation concerning eligibility, he was immediately eligible for another discretionary parole. If

---

**3.** The complaint alleged discrimination against inmates of all minority races, but there has been no evidence to show that blacks have been discriminated against. The complaint also alleged discrimination in the administration of the work release program as well as in the awarding of discretionary paroles. However, there has been absolutely no evidence of discrimination with regard to the work release program.

he did not receive that parole, he was counted as having received a discretionary parole (the first) and as having been eligible for a parole (the second) but not receiving it. The plaintiffs justified this method because in those situations the Board exercised its discretion twice. The Court finds this to be a valid and acceptable method of study. Second, the study did not consider the length of time for which an inmate was eligible for discretionary parole. For example, Indian Example No. 5 received a mandatory parole on March 2, 1972, which was revoked on March 28, 1972. He was again incarcerated until his sentence expired on May 10, 1972. Technically, he was eligible for parole from March 28 to May 10, yet his failure to receive a discretionary parole during that time counted the same as an inmate who had been eligible for a much longer time. Third, for an unknown reason, the study did not cover women inmates although their paroles were governed by the same statutes and subject to the same exercise of discretion. Fourth, race was the only variable controlled by the study. Except to the extent that they might have affected an inmate's eligibility for parole, other objectively determined variables were not considered, such as the inmate's prior criminal record, whether the inmate had previously been released on parole and, if so, how he performed, the length of his sentence, the severity of the crime, and the inmate's institutional record.

The defendants then provided a study which challenged the accuracy of plaintiffs' figures. That study corrected two errors made by the plaintiffs. One Indian inmate, whom the plaintiffs had considered as not having received a discretionary parole, had actually been released on parole. It also showed that one inmate, who had been listed as an Indian, was a Mexican-American.

Except for these corrections, the Court affords no weight to this study because it did not provide an adequate basis on which to compare the treatment of races and because it was based upon factual assumptions which the defendants were unable to support. For example, the study tried to show that eight inmates, who had received major disciplinary reports within six months prior to their parole hearing, were not eligible because the Board had a policy of denying parole to all such inmates. However, the testimony revealed that there was no such uniform policy. By way of a further example, this latter study claims that prior to January, 1973, a number of inmates who have received flat sentences for a term of years were not considered to be eligible for parole, under an Attorney General's opinion, until they had served that sentence less reductions for good behavior. However, such inmates were eligible at an earlier time if the sentencing judge consented to an early parole. Neb. Rev.Stat. § 83–1,110(1). Testimony revealed that on some occasions the Board, on its own initiative, requested the sentencing judge's consent for an early parole and that the judges sometimes consented. The Board had no uniform policy on requesting consent. Since the Board could and did exercise its discretion to help some inmates to become eligible at an earlier date, it is not completely fair to say, as the defendants do, that inmates were not eligible for parole until they had served the flat sentence less good time.

■ Except for the above corrections to the plaintiffs' figures, the defendants have introduced no evidence to explain the alleged statistical disparity on grounds other than race. Nor have they provided any evidence to show that the plaintiffs' method was unreliable or that the alleged disparity could have resulted by accident or chance. There was some testimony from the defendants that they did not discriminate against inmates because of their race, but such evidence standing alone is, as a matter of law, insufficient to rebut a *prima facie* case. *Murrah v. Arkansas,* 532 F.2d 105 (8th Cir. 1976); *Quadra v. Superior Court,* 378 F.Supp. 605 (N.D.Cal.1974). The question then becomes whether the plaintiffs' statistical evidence is sufficient to establish a *prima facie* case. If it is, plaintiffs are entitled to relief.

Section 83–1114 sets forth a number of factors which must be considered and subsection (1) of that statute provides that parole must be granted unless certain conclusions are reached. Although the factors to be considered have been set out, whether the inmate has satisfied those requirements and whether an inmate should be released on parole is left to the informed judgment of the Board. Procedures such as this which depend upon suggested evaluations and give wide latitude for making such evaluations provide a favorable climate for racial discrimination by affording an easy opportunity to disguise discriminatory acts. *See, e. g., Rowe v. General Motors Corp.,* 457 F.2d 348, 351 (5th Cir. 1972).

■ Because of the difficulty in proving intentional discrimination by direct evidence, statistical evidence showing racial disparities has been afforded great weight by the courts. *Alabama v. United States,* 304 F.2d 583 (5th Cir.), *aff'd per curiam,* 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112 (1962). It is circumstantial evidence which, when considered with other evidence, may give rise to the inference that the defendants have acted with the requisite discriminatory purpose. In some cases its effect may be to demonstrate racial discrimination because it may be very difficult for defendants to explain their acts on non-racial grounds. This type of evidence has been found to be persuasive in a variety of civil rights cases. *See, e. g., Hawkins v. Town of Shaw, Mississippi, supra* (discrimination in providing municipal services); *United States v. Youritan Construction Co.,* 370 F.Supp. 643, 649–50 (N.D.Cal.1973), *rev'd in part on other grounds,* 509 F.2d 623 (9th Cir. 1975) (discrimination in housing). The cases involving discrimination in the selection of grand and petit juries are particularly instructive. In such cases a *prima facie* case has been established when it has been shown, first, that the statistical disparities in representation on the jury list exist between identifiable groups and the entire population of citizens eligible to serve on the jury; and, second, that there is a clear and easy opportunity for the defendants to discriminate or, at least, that the disparity originates at a point in the selection process where the defendants invoked their subjective judgment. *Johnson v. Durante,* 387 F.Supp. 149 (E.D.N.Y.1975). *See Alexander v. Louisiana,* 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972); *Turner v. Fouche,* 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970); *Murrah v. Arkansas, supra; McGhee v. King,* 518 F.2d 791 (5th Cir. 1975); *Quadra v. Superior Court,* 378 F.Supp. 605 (N.D.Cal.1974); *Penn v. Eubanks,* 360 F.Supp. 699 (M.D.Ala. 1973).

The plaintiffs' figures, which have been corrected to account for the two errors noted by the defendants, are susceptible to two conflicting interpretations. The first, which set forth the percentage of eligible inmates of each race who actually received discretionary paroles, shows: 60.7 per cent of the eligible Caucasian inmates received a discretionary parole; 63.2 per cent of the eligible black inmates received a discretionary parole; 40.7 per cent of the eligible American Indian inmates received a discretionary parole; 27.8 per cent of the eligible Mexican-American inmates received a discretionary parole.

■ But the Court cannot accept statistics blindly or uncritically. *Logan v. General Fireproofing Co.,* 521 F.2d 881 (4th Cir. 1971). The second interpretation of the same figures, comparing each race's percentage of the eligible population with each race's percentage of the discretionary paroles awarded, shows: caucasian inmates comprise 65.4 per cent of the population eligible for a discretionary parole; caucasians received 66.9 per cent of the discretionary paroles awarded. Black inmates comprise 26.1 per cent of the population eligible for a discretionary parole; blacks received 27.7 per cent of the discretionary paroles awarded. Indian inmates comprised 6.5 per cent of the population eligible for a discretionary parole; Indians received 4.5 per cent of the discretionary paroles awarded. Mexican-American inmates comprise 2 per cent of the population eligible for a discretionary parole; Mexican-Americans received .9 per cent of the discretion-

442

ary paroles awarded. These figures show statistical disparities of two per cent or less which the Court considers to be insignificant.

The conclusions under the second method, which is the same method used in the above-cited jury discrimination cases, are entitled to at least as much weight, if not more, as those urged by the plaintiffs under the first method. When these conflicting interpretations are considered with the deficiencies in the plaintiffs' method, as previously noted (*supra*, pp. 439–440), they do not satisfactorily prove a statistical disparity in the treatment of races.[4] Even if the deficiencies in the plaintiffs' method were not considered, the best that could be said for plaintiffs' figures is that they are inconclusive. The Court, therefore, finds that the plaintiffs have failed to prove by a preponderance of the evidence a statistical disparity in the treatment of races and, therefore, they have failed to prove a *prima facie* case of racial discrimination.

█ The plaintiffs have also mounted a wide-ranging attack on the administration of the prison system itself, claiming that it fosters institutional racism which makes it more difficult for members of minority races to fulfill the conditions necessary to receive a discretionary parole, to successfully complete that parole, or to readjust to society. The plaintiffs request, as part of the proposed relief, that more minorities be hired as counselors, parole officers and other prison administrators. However, it is unnecessary to examine whether these conditions violate the Fourteenth Amendment rights of inmates because it is clear that under state law, the defendants as the Board of Parole have absolutely no control over those conditions. Although all the parties seem to agree that a higher percentage of minority members as prison officials would be helpful in maintaining better communications and rapport between minority

inmates and prison personnel, the Board of Paroles has no power whatever to hire such employees. Nor has it been shown how any action (or inaction) by the Board members has caused or contributed to the deprivation of inmates' constitutional rights in this regard.

Regarding the *Inmates* case, in a separate Memorandum and Order entered this day, the Court has vacated the order dismissing the claim that some inmates were denied procedural due process in parole proceedings. Therefore, one claim remains to be decided by the Court. This claim, however, is not so closely related to the claims of racial discrimination or denial of access to the courts such that the entry of judgment on those issues decided in this Memorandum Opinion, and an appeal therefrom if the parties so wish, should be delayed while the issue of procedural due process is litigated. It is therefore the finding of this Court, pursuant to Rule 54(b), Fed.R.Civ.P., that there is no just reason for the delay of entry of judgment on the issues decided in this Memorandum Opinion and that judgment be entered in favor of the defendants on the issues of racial discrimination and denial of access to the courts. A separate order will be entered this date in accordance with this Memorandum Opinion.

### ORDER

#### On Motion to Alter or Amend

█ These matters come on for determination with reference to defendants' motion to alter or amend the judgment entered by this Court in the above-entitled causes, dated July 14, 1976. Defendants object to paragraph 4 of said judgment order which provides in pertinent part:

[T]hat defendants pay the costs and expenses incurred by court-appointed counsel for the subclass of inmates alleging denial of parole for racially discriminato-

---

4. Another possible deficiency is that the number of Mexican-American inmates may be too small to provide a basis for reliable conclusions. There were only eighteen Mexican-Americans eligible for parole out of a total eligible population of 902 during the two-year period studied. The Court has substantial doubt that this figure was large enough. *See Mayor of Philadelphia v. Educational Equality League, supra,* 415 U.S. at 621, 94 S.Ct. 1323, which held that statistical conclusions based on twelve positions were speculative.

ry reasons in the amount of $1,098.28; and that defendants pay the costs and expenses incurred by the court-appointed counsel for the subclass of inmates alleging denial of parole due to their activities in the courts in the amount of $125.06. *Inmates v. Greenholtz*, CIV. 72–L–335 (July 14, 1976) (Filing No. 165).

Upon a careful reconsideration, the Court finds that there is simply no provision, statutory or otherwise, under the circumstances of the instant case for awarding costs and expenses to counsel appointed to represent the subclass of inmates alleging denial of parole for racially discriminatory reasons. This subclass did not prevail on the merits, nor does the record reveal sufficient reason to justify such an award.

 With respect to the subclass of inmates alleging denial of parole due to their activities in the courts, however, the Court finds that counsel should be awarded reasonable costs and expenses. In the Memorandum Opinion of this Court it was noted:

The Board had a long-standing policy of not considering an otherwise eligible inmate for discretionary parole if, at the time his parole status was reviewed, he had legal actions pending in the courts. This policy was in effect in 1970 when defendant Greenholtz became Chairman of the Parole Board and the policy was continued until 1973. In the fall of 1973 the Board abolished this policy on the grounds that it interfered with the inmate's right to seek redress of his grievances in the courts. There is no credible evidence that, after that date, the Board has deferred or denied parole to any eligible inmate for the reason that he had an action pending in the courts.

It is obvious that access to the courts is a fundamental right of every citizen, including those persons confined in prisons. It is absolutely essential that those individuals be afforded every reasonable opportunity to present their complaints to the courts and to obtain a judicial resolution of those complaints. * * *

The Board's policy of not considering an inmate for parole if he had legal actions pending punished those inmates who had sought relief in the courts and discouraged other inmates from seeking relief in court. This policy obstructed the inmates' access to the courts in violation of their constitutional rights. (Citation omitted.)

The defendants do not seriously attempt to justify their practice, but they argue that relief is not warranted because this practice has long since been discontinued. Since the evidence shows that the Board has discontinued this practice and that it will not be applied in the future, there is no threat of future irreparable injury and an injunction is, therefore, not necessary. (Citation omitted.) *Inmates v. Greenholtz, supra*, at 436–437.

In effect, the Board's policy would have been held unconstitutional but, as noted above, the policy was discontinued. Under these circumstances, the Court will consider the plaintiffs as prevailing parties for the purposes of awarding costs. *See Parham v. Southwestern Bell Telephone Co.*, 433 F.2d 421 (8th Cir. 1970); *Newport News Fire Fighters Association v. City of Newport News*, 339 F.Supp. 13 (E.D.Va.1972). Reasonable expenses will also be allowed under The Civil Rights Attorney's Fees Awards Act of 1976, Pub.L.No.94–559, 90 Stat. 2641 (Oct. 19, 1976). *See* S.Rep.No.94–1011, 94th Cong., 2d Sess. 5 (1976), U.S.Code Cong. & Admin.News 1976, p. 5908. The Court, however, declines to award any further fees.

Accordingly, Paragraph 4 of the aforementioned judgment order is hereby modified to read as follows:

4) Each party to pay its own costs, with the exception that defendants pay the costs and expenses incurred by the court-appointed attorney for the subclass of inmates alleging denial of parole due to their activities in the courts in the amount of $125.06.

IT IS SO ORDERED.